APPEAL NO. 11-4631

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RYAN HOLNESS,

*Defendant-Appellant.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

(THE HONORABLE WILLIAM M. NICKERSON,  S.U.S.D.J.)
_____

BRIEF OF APPELLEE
UNITED STATES OF AMERICA
_____

Rod. J. Rosenstein
United States Attorney

John F. Purcell, Jr.
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209 - 4800
Attorneys  for Appellee

March 27, 2012

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Government's Theory of the Case . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Murder of Serika Dunkley and the Arrest of Holness . . . . . . . . . 6

    C.    Holness's Statements to Sgt. Hall . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.    The Dog Track, DNA Evidence, and the Motive . . . . . . . . . . . . . . . 16

    E.    The Testimony of Holness's Cellmate Stephen McGrath . . . . . . . . 21

    F.    Holness Requests McGrath To Help Him to Create a
          False Third-Party Confession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    G.    McGrath Is Outed as a "Snitch" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    H.    The Hearing on Holness's Motion to Suppress . . . . . . . . . . . . . . . . 29

    I.    The District Court Denies Holness's Motion to Suppress . . . . . . . . 34

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.    The Sixth Amendment Right to Counsel That Attached to Holness's State
    Murder Indictment Did Not Extend to Any Evidence Obtained by McGrath
    That Was Introduced at the Trial on Holness's Subsequent Federal
    Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

A.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.      The Sixth Amendment Is Offense Specific and Does Not Extend to
Statements Made by the Defendant Prior to the Federal Indictment
That Led to the Trial in Which The Statements Were Introduced . . 37

C.      Holness Concedes That the Sixth Amendment Was Not Implicated
by Any Statements to McGrath Prior to August 31, 2009 . . . . . . . . 43

D.      There Was No Interrogation of Holness by McGrath . . . . . . . . . . . . 47

E.      The Physical Evidence Recovered from Holness's Cell Was
Not Protected by the Fourth Amendment . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

STATEMENT WITH RESPECT TO ORAL ARGUMENT . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Blockburger v. United States*, 284 U.S. 299 (1932) . . . . . . . . . . . . . . . . . 35, 41, 42

*Harker v. Maryland*,  800 F.3d 437 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . 44, 49

*Howes v. Fields,* ___U.S. ___, 2012 WL 538280 (2011) . . . . . . . . . . . . . . . . . . 52

*Hudson v. Palmer*, 468 U.S. 517 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Illinois v. Perkins*, 492 U.S. 292 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 52

*Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Maine v. Moulton*, 474 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40, 43

*Maryland v. Shatzer,* ___U.S. ___, 130 S. Ct.1213 (2009) . . . . . . . . . . . . . . . . . 52

*Massiah v. United States*, 377 U.S. 201 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) . . . . . . . . . . . . . . . . . . . . . 38, 39, 40, 43

*Rhode Island v. Innis*, 446 U.S. 291 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Samson v. California*, 547 U.S. 843 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Texas v. Cobb*, 532 U.S. 162 (2001) . . . . . . . . . . . . . . . . . . . . 38, 39, 40, 41, 42, 43

*Thomas v. Cox*, 708, F.2d 132 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v.  Alvarado*, 440 F.3d 191 (4th Cir. 2006) . . . . . . . . . . 39, 40, 42, 43

*United States v. Henry*, 447 U.S. 264 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*United States v. Jeffus*, 22 F.3d 554 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Kidd*, 12 F.3d 30 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Lentz*, 524 F.3d 501 (4th Cir. 2008) . . . . . . . . . . . . . . . 36, 44, 49

*United States v. Lewis*, 606 F.3d 193 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Payne*, 954 F.2d 199 (4th Cir. 1992) . . . . . . . . . . . . . 38, 39, 40, 43

## STATUTES

18 U.S.C. § 1512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2261(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATEMENT OF JURISDICTION

Defendant Ryan Holness ("Holness") was charged in a four-count Second Superseding Indictment. Count One alleged interstate travel with intent to kill or injure a spouse, resulting in the death of Serika Dunkley, in violation of 18 U.S.C. § 2261(a)(1); Count Two alleged attempted obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); Count Three alleged attempted witness intimidation, in violation of 18 U.S.C. § 1512(b)(1); and Count Four alleged passport fraud, in violation of 18 U.S.C. § 1544. JA 3, 41-44.[1] The district court (William N. Nickerson, S.J.) had jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

I.  Whether the district court properly held that the defendant's Sixth Amendment right to counsel was not violated, where the contested statements of the defendant were made to a jailhouse informant while the defendant was under state indictment for first degree murder but prior to the defendant's indictment for the federal offenses that led to the trial at which the statements were introduced.

---

[1] "JA" refers to the Joint Appendix. "Def. Br." refers to Holness's Opening Brief.

## STATEMENT OF THE CASE

On November 24, 2009, a grand jury sitting in the District of Maryland returned an Indictment against Holness. JA 3. On March 1, 2011, the grand jury returned the Second Superseding Indictment. JA 6, 41-44. On March 14, 2011, a hearing was held on various pretrial motions. JA 8, 59-126. A jury trial, presided over by Judge Nickerson, commenced immediately upon conclusion of the motions hearing. JA 8. On March 28, 2011, the jury returned guilty verdicts on Counts One, Two, and Three (Count Four having been severed by agreement). JA 9. On May 25, 2011, the court denied Holness's motion for judgment of acquittal, but granted a new trial on Count Two. JA 10. On June 9, 2011, the court imposed a sentence of life imprisonment as to Count One and, as to Count Three, a concurrent sentence of 240 months. JA 10, 714-15. Immediately following the sentencing, the court granted the government's motion to dismiss Counts Two and Four. JA 10, 714. On June 13, 2011, Holness filed a timely notice of appeal. JA 11, 720.

## STATEMENT OF FACTS

### A.     The Government's Theory of the Case

While Holness's appeal challenges the admission of certain statements he made to a cellmate, and certain physical evidence provided to investigators by that cellmate, the record of the admission of the contested evidence cannot be properly

considered in isolation, as it is part of the larger foundation of evidence without which the government's theory of the case, which was evidently accepted by the jury, cannot be understood.

As discussed in detail below, the evidence presented at the trial of this case related the facts and circumstances surrounding the murder by Holness of his wife, Serika Dunkley, in Kent County, Maryland, on June 5, 2009. The evidence showed that Holness and Ms. Dunkley were both from Jamaica and that they were married there in 2003, following which Holness moved to the United States and enlisted in the United States Navy. JA 287-88, 293-94, 626-27. Holness eventually became an air traffic controller and served with the Fleet in that capacity. JA 372. Holness and Ms. Dunkley never lived together as a couple. JA 287-88. Their marriage was designed to make it easier for Ms. Dunkley to emigrate to the United States, and she ultimately settled in New York City. Holness had other relationships, and he had a young son who lived with his mother in Jamaica. JA 454, 643.

The circumstances that appear to have led to the murder of Ms. Dunkley began in 2008, when Dunkley was discovered to have committed passport fraud in an attempt to bring his son into the United States. JA 449- 451. That discovery thwarted those efforts and an ensuing investigation by the Navy resulted in court-

martial proceedings against Holness and in his reassignment from air traffic control to menial "make work." JA 454, 643. In late 2008, Holness purchased a $500,000 life insurance policy for Ms. Dunkley, designating himself as sole beneficiary. JA 357, 366. In early 2009, Holness's request for early release from the Navy was denied. The government argued that with the prospect of his son joining him dimming and any future as a civilian air traffic controller in doubt, Holness devised a desperate plan to murder his wife and use the proceeds of her life insurance policy to finance his return to Jamaica with sufficient resources to begin a new life with his son.

In June 2009, Holness's need for Ms. Dunkley to travel to Maryland presented an opportunity for Holness and a still unknown accomplice to kill her during what Holness claimed was a random carjacking. JA 287-88, 293-94. The murder scheme required that Ms. Dunkley be stabbed to death, as the use of a knife by the carjacker buttressed Holness's self-portrayal as a victim, as he, too, was "stabbed." That the murder weapon was a knife also provided credible corroboration of Holness's story and lent itself to staging a murder scene replete with evidence from the blood and DNA of an unknown male – Holness's carjacker – thereby leading investigators away from Holness.

As Holness's story unfolded, however, it did not hold up. Holness's account of the murder was vague, inconsistent, and implausible. Other weaknesses were his medically unsubstantiated claim that he was knocked out and unconscious for more than four hours before he sought help. JA 184-88, 202-3, 298-314, 329-32. Also, Holness did not anticipate that a police bloodhound would track his scent from the murder scene to a nearby bridge over the Chester River, which strongly suggested that Holness, who specifically denied walking in that direction, disposed of the murder weapon and Ms. Dunkley's cell phone in the river, and then, after allowing time for his accomplice to dispose of his car in Washington (where Holness counted on it being found) he finally reported the "crime." JA 141-148, 329-31, 633-35, 657-664.

Holness's story failed to convince investigators, and he was arrested and charged with the murder of Ms. Dunkley. While imprisoned at the Kent County Jail, Holness concocted Plan B, his creation, with an accomplice who unfortunately for Holness became an informant, of a third-party "confession" that was designed to cause the dismissal of his murder charges. JA 540-55. It was in the course of producing the third-party confession that the statements and evidence that Holness unsuccessfully sought to suppress were obtained. Those statements and evidence are the subject of this appeal.

**B.      The Murder of Serika Dunkley and the Arrest of Holness**

At about 5:30 a.m. on June 5, 2009, Kent County Deputy Sheriff Amanda
Davis was the first of several officers who responded to the residence of John and
Kimberly Rolfe, located on Route 290 in the rural town of Crumpton, MD,
following a 911 call by the Rolfes to report that a female had been stabbed.  JA
172, 175, 664, 671.[2]  When she arrived at the Rolfe residence, Deputy Davis
encountered Holness sitting on the front porch.  Deputy Davis observed that
Holness was wet, shaking and crying, and that he was wearing socks but no shoes.
JA 174.  She also observed a laceration on his left arm and noticed that a piece of
duct tape was hanging from Holness's neck.  JA 175, 177, 181.  Since the police
dispatch mentioned that a woman had been stabbed, Deputy Davis asked Holness
about the reported victim.  JA 175.  Holness did not respond, but Mr. Rolfe told
Deputy Davis that Holness had stated that "his wife" was in a field about 500 yards
south of his house.  JA 175, 664.

Accompanied by two other officers, Deputy Davis proceeded to the murder
scene, which was .26 miles south of the Rolfes' home.[3]  Deputy Davis observed

_____

[2]      Aerial photographs of Route 290 and the Chester River Bridge, as
well as photographs of the victim and the injury to Holness are included in the
Joint Appendix at pages 664-80.

[3]      Later investigation established that it took about four minutes and
thirty seconds to walk the .26 miles from the murder scene to the Rolfe house.  JA

some personal items strewn about the road before she located the deceased victim in a field just beyond the east side of Route 290. JA 179-80, 206, 212, 664, 666 (photo of victim).

After locating the body of the victim, Deputy Davis returned to the Rolfe house and conducted a brief interview of Holness. JA 182-89. Holness told her that he and his wife left New York the previous evening and were carjacked at a rest stop on the New Jersey Turnpike when they stopped to "get something to drink." JA 182. Holness stated that when he returned to the car there was a man with a gun in the back seat. JA 182. In this brief interview, Holness did not mention that the carjacker used some sort of device to disguise his voice or that the carjacker was a former marine. Holness also did not describe how his wife was murdered or that he had been bound with duct tape and then kicked in the head and left unconscious for more than four hours, all of which he later told other investigators. JA 184-88.

From the Rolfes' house, Holness was transported to the emergency room at the Chester River Hospital Center where he arrived at about 6:57 a.m. Holness was treated by Dr. Deborah Davis. Dr. Davis testified that the nurse who initially saw Holness reported in her notes that, "Patient states that he and his wife were

272.

carjacked in New Jersey and driven to the local area. It is unclear at this time when the patient was injured, patient is very vague about details." JA 192-95. Holness's affect was noted to be "flat." JA 196. Holness later told the nurse that "the incident began around 1:30 this morning," more than four hours before Holness appeared at the Rolfe house. JA 196.

As Deputy Davis had noted, Holness's condition was unremarkable except for a laceration to his left arm, which Holness claimed was inflicted by the carjacker. JA 194-95, 197-98, 672. Dr. Davis testified that, based on her training and experience, the laceration was more accurately described as a "cut" rather than a "stab." JA 194, 199. The cut on Holness's arm, which was cleaned and sutured, took about ten minutes to treat. JA 199.

In addition to the laceration, Holness also complained of pain in his right side rib cage. JA 197. An x-ray revealed "a non-displaced distal eighth rib fracture." JA 200. No injury was found to Holness's jaw or his wrists. JA 204. As follow-up treatment it was suggested that Holness could take ibuprofen. JA 202. Dr. Davis testified that Holness never mentioned to her or anyone else at the hospital that he had been knocked unconscious for several hours, nor did she observe evidence of an injury that would account for Holness's later claim that he

was kicked in the head by the carjacker and was unconscious for the four and one-half hours before he went to the Rolfe residence for help. JA 202-03.

The crime scene on Route 290 was processed by State Police Crime Scene Technician (CST) Melissa Harvey. JA 221-50. Photographs of the victim included close-ups of multiple knife wounds and of chipped polish on the victim's fingernails. Photographs were also taken of defensive wounds on the victim's hands. JA 213, 262, 666. CST Harvey also recovered various personal items found on the roadway, including one of Holness's shoes, his driver's license and military identification, black gloves, a plastic water bottle, a woman's sandal, a purse, and a soft cover book. JA 215-16, 219, 230-40, 247-48. CST Harvey noted that two pages of the book were stuck together with what appeared to be blood and that the bloodstains on the facing pages mirrored each other, indicating that the book had been open when the staining occurred. JA 241-42. CST Harvey observed that the victim's purse was zipped closed and that the contents of the purse appeared to be undisturbed. JA 240. CST Harvey also recovered several twisted pieces of duct tape from the west side of the roadway. JA 238-39.

Before going to the crime scene, CST Harvey had photographed Holness at the hospital, where she recovered his clothing and obtained fingernail scrapings and DNA samples from him. JA 226-30. She testified that she did not observe any

duct tape residue on Holness's clothing or person, other than the piece of tape on his neck. JA 226-27. Subsequent examination of scrapings from the pants Holness was wearing revealed eighteen fragments of what appeared to be "glittery" blue and pink nail polish. JA 472, 666. Five fragments of blue, red, and yellow nail polish were also recovered from scrapings from the shirt Holness had been wearing. These scrapings were found to match the nail polish observed on Ms. Dunkley's chipped finger and toe nails. JA 472-73.

Ms. Dunkley's body was transported to Baltimore where an autopsy performed by an assistant state medical examiner revealed that she had suffered eleven sharp force injuries (stab wounds) and several blunt force injuries. JA 251-98. The cause of death was determined to be multiple sharp force injuries to the victim's chest and the front and back of her neck. JA 268. The stab wounds inflicted upon the victim included one that cut the left jugular vein. JA 254, 258-59. Another severed her thyroid gland and injured her windpipe. JA 254. The victim also suffered a very large gaping wound of the neck that was consistent with a "knife cutting or being drawn across the neck." JA 255-56. The medical examiner concluded that several of the stab wounds to the victim resulted in injury to "vital structures" that could rapidly cause one to bleed to death. JA 261. The

medical examiner also testified that he observed "defensive wounds" to the victim's hands and fingers.  JA 262.

C.   **Holness's Statements to Sgt. Hall**

The lead investigator of the murder of Serika Dunkley was Maryland State Police homicide Sgt. Steven Hall.  Sgt. Hall testified that he initially encountered Holness in the emergency room at the Chester River Hospital on the morning of June 5, 2009.  JA 281.  Holness was wearing a hospital gown, and despite the recovery of pieces of duct tape at the murder scene and Holness's statements that he had been bound with duct tape, Sgt. Hall did not observe any duct tape residue on Holness's face, beard, wrists, or ankles.  JA 281-82.  Sgt. Hall did observe that Holness had a "fairly clean" laceration across his left forearm.  JA 283, 672 (photo).

Sgt. Holness testified that following Holness's release from the hospital he was transported to the Centreville barracks to be interviewed.  Sgt. Hall testified that he advised Holness of his *Miranda* rights, both verbally and in writing, and that the ensuing interview was recorded and videotaped.  JA 285-86, 291-92, 667. Sgt. Hall recounted that Holness displayed no emotion or reaction when he was informed that wife was dead.  JA 286.

Holness told Sgt. Hall that he and his wife left Brooklyn on the night of June 4 and that prior to doing so he had stopped for gas near his mother's home. JA 286. Holness stated that he and Ms. Dunkley did not live together, but had been traveling to Lexington Park, MD, to sign the lease for his townhouse. The lease required his wife's signature in order for Holness to obtain a discount for military personnel. JA 287-88, 293-94. Holness stated that he planned to drive his wife back to New York after signing the lease on June 5. JA 297-98.

Holness explained that after leaving New York with his wife, he stopped at a rest stop on the New Jersey Turnpike to purchase gas. JA 298. A credit card receipt found in Holness's car put the time of that purchase as 11:14 p.m. on June 4, 2009. JA 299. Holness stated that after pumping the gas, he pulled into a truck parking area at the rest stop, got out, and urinated between some parked trucks. JA 302-03. Holness stated that when he returned to his car, there was a "masked person" in the back seat with a gun pointed at his wife's head. JA 302-03. Holness stated that he could not originally say whether the person was a man or a woman because the carjacker was using some sort of device to distort his voice. JA 303-04. Holness said that the person ordered him to get back on the turnpike and drive, so Holness "just continued" to follow his normal route to Maryland. JA 306-07. Holness said that during the drive the person was "ranting about his

marine days and the torment, you know, wife drained his bank account you know, took his kids." JA 305, 308. Holness stated that "from what [the person] was saying, he have problems with women" and said that "they all bitches." JA 307. Holness explained, in response to being asked why he did not seek help at a toll booth, that he avoided Interstate Route 95, "because, you know, it's a lot of tolls on 95." JA 308.

Holness told Sgt. Hall that they arrived in Crumpton, Maryland, at about 1:30 a.m., and that the carjacker "directed him to pull into the farm lane." JA 309, 664.[4] Holness stated that the carjacker directed him and his wife to get out of the car. When they were all standing on the driver's side of the car, the carjacker started to tape Holness's hands with duct tape. JA 309. Sgt. Hall stated that when he asked Holness how the person could manage to tape his arms while he was carrying a gun, Holness replied that the carjacker put the gun on the trunk while he taped his wrists. JA 310. Holness also mentioned that the carjacker taped a bandana over his mouth. JA 311. Holness stated that while he was being bound with duct tape, his wife bolted and ran around the car to the passenger side.

---

[4]    Sgt. Hall obtained records showing that at 1:23 a.m. on June 5, 2009, Ms. Dunkley's cell phone registered on a cell tower in the vicinity of Crumpton, MD. Her cell phone was never recovered. JA 630, 632.

Holness stated that the carjacker chased her and Holness heard her scream, "he's cutting me." JA 311.

Sgt. Hall testified that Holness described how he received the laceration to his left arm. JA 312, 672. Holness stated that when he ran after his wife, the carjacker came after him with a knife. The carjacker slashed at Holness's neck, but the knife struck Holness in his uplifted arm. Holness stated:

> He laid on the ground with me, too, and then I don't know what happened. He just jumped in the car and left. No. Before that, before that–sorry. He ran down to the car. I don't know. He backed up a little bit and he came back and he gave me one kick in the side of my chin right here on my jaw and I'm knocked out.
>
> Question [Sgt Hall]: So--
>
> Answer [Holness]: And when I wake up, I was like this, from what I can remember.

JA 313. Holness explained that when he woke up his ankles and wrists were bound. JA 314. Sgt. Hall testified that when he noted the difference between the injuries to the victim and the single laceration to Holness's arm, Holness responded that he was "just lucky." JA 644.

Confronted with an unbelieving Sgt. Hall, Holness concluded the initial interview that morning by requesting an attorney. JA 84. Later that afternoon, however, Holness asked Sgt. Hall to transport him to the murder scene so he could show the investigators what happened. JA 320. At the scene, Holness reenacted

the murder. He told the investigators that he had just crossed the Chester River Bridge on Route 290 when the carjacker told him to pull over to the right (west) onto an access road for farm vehicles. JA 322, 325, 664. Holness explained that one of his shoes came off in the mud (it was found) and he described how his wrists were taped and a bandana was placed into his mouth. JA 323. Holness explained that as he was being bound, "Serika saw it and made a break for it." JA 324. Holness stated that the carjacker followed her, after which Holness could see him striking her - with what he was not sure. JA 324. Holness stated that after he ran after his wife, he tried to run back to the car, but he fell or was knocked down by the carjacker near the front of the car. JA 326.

Holness stated that he was kicked in the head and knocked unconscious, and he demonstrated how his wrists and ankles were taped together when he regained consciousness. JA 329-31. Holness explained that he used a piece of plastic he found on the road to cut the tape, and, upon freeing himself, he walked directly to the Rolfes' house, which he could see from the murder scene. Holness made contact with the Rolfes at about 5:45 a.m. JA 664. They called 911, and Deputy Davis arrived at 5:50 a.m. JA 277, 332, 664.

Maryland State Police Sgt. Michael Smith accompanied Holness during the videotaped reenactment. JA 318-34. Sgt. Smith testified that prior to the

reenactment, investigators had received information from Cassandra Lupton, whose home was located just before the north end of the Chester River Bridge (JA 665 for photo). Ms. Lupton told investigators that at 3:23 a.m. that morning she had been awakened by knocking, first on the front door and then on the back door of her home. JA 157-61, 274. Based on that information, Sgt. Smith specifically asked Holness if at any point he had walked *southbound* from the murder scene, that is, in the direction of the Lupton house and the bridge. JA 332. Holness responded that once he succeeded in freeing himself he walked to the Rolfes and that he never walked toward the bridge or sought help anywhere else. JA 332, 665-66.[5]

## D.    The Dog Track,  DNA Evidence, and the Motive

In further regard to Holness's account of the crime, the jury heard that on June 5 the state police brought a certified tracking canine to the scene, a bloodhound handled by Corporal Colleen McCurdy, to attempt to follow Holness's trail from the murder scene. JA 141. Using the scent from Holness's socks, which were recovered from the hospital, the bloodhound tracked Holness *southbound* from where the victim's body was recovered along Route 290. JA 143-45, 665 (aerial photo of dog track). Proceeding south along Route 290, Holness's scent

---

[5]    Sgt. Hall testified that the distance from the murder scene to Ms. Lupton's (just north of the Chester River bridge) was .48 miles. JA 273, 665.

trail crossed a field and then led directly to the home of Cassandra Lupton. The bloodhound went to the front door and then around the house to the back door. JA 148. As noted, Ms. Lupton had reported that someone had knocked on her front and back doors at about 3:23 a.m., which, according to Holness's statement to Sgt. Hall, would have been while Holness was still unconscious. JA 313. The scent trail, described by the bloodhound handler as a "really good trail," continued from the driveway in front of Lupton's house to the middle of the Chester River Bridge. There the trail went directly to the railing over the Chester River, into which the bloodhound actually attempted to jump. JA 148-49, 665. From the bridge, the bloodhound followed the scent trail back to the murder scene, where the track concluded at about 3:00 p.m. JA 150-51, 665.

Further evidence concerning the issue of whether Holness walked *south* from the crime scene to the Chester River was presented by government witness Erin Boulter. JA 657-62. Ms. Boulter testified that sometime between 5:00 and 5:15 a.m. on the morning of June 5, 2009, she was driving southbound on Route 290. Just before she reached the bridge she observed "an African American man standing off to the side of the road, almost in the middle. And I actually had to swerve to avoid him. And as I passed him it occurred to me after my headlights had hit on him, that it seem[ed] like there was something silver on his wrists. And

then I thought it might have been duct tape.  It gleamed silver and was kind of bright." JA 659-61, 665.  Ms. Boulter's observation of a person with duct tape on his wrists near the north end of the Chester Bridge occurred at least one-half hour *before* Holness appeared at the Rolfe home, to which Deputy Davis responded at 5:50 a.m.  JA 173, 664.

Late on June 5, 2009, Holness's blue Honda Accord was found on H Street in Washington, D.C., which investigation showed was one hour and 21 minutes from Crumpton.  JA 275, 633-35.  During the investigation, a computer from Holness's residence was searched, pursuant to which it was discovered that in late May and early June 2009, Google searches had been made for the schedules for Apex and Greyhound buses that stopped one block and seven blocks, respectively, from where Holness's car was found in Washington, D.C.  JA 458-59, 633-34.

Holness's car was removed to a state police garage in Maryland where it was processed by Trooper Robert Miller on June 6, 2009.  JA 391.  Swabs and cuttings were taken of what appeared to be bloodstains found in several locations inside the vehicle.  JA 397-98.  Trooper Miller also took several swabs from a roll of duct tape that was recovered from the floor under the driver's seat.  JA 407, 410.  The swabs from Holness's car were submitted for DNA analysis, the results of which were summarized in a chart that was presented at trial by State Police forensic

scientist Teri Zerbe. JA 416-45, 674-77 (chart). In sum, testing of the swabs from the evidence recovered at the murder scene and from Holness's car confirmed that DNA of a person referred to as "unknown male #1" was recovered from blood swabs of the interior driver door, the steering column, the victim's sandal, and the exterior of her purse. JA 765-77. "Unknown male # 1" was also found to be the source of large bloodstains found on the facing pages of the paperback book recovered at the murder scene. JA 765-77.

DNA matching that of Holness was recovered from blood found *inside* his car to the left of the driver's seat (corresponding with the laceration to Holness's left arm). Of note is that Sgt. Hall confirmed that Holness never described getting back into the car after he was stabbed. JA 637, 643, 674. Also, although Holness never mentioned touching any rolls of duct tape, Holness was found to be the source of DNA found on three swabs taken from the *inside* of the roll of duct tape recovered from under the driver's seat of his car. JA 442-43, 637, 673 (photo of roll of tape), 675. *Only* Holness's DNA was found on two of three swabs from the inside of the roll of duct tape. JA 443, 673, 675. The roll of duct tape from Holness's car was also opined to be the source of the fragments of duct tape found at the murder scene. JA 475-78.

At trial, Sgt. Hall testified that the Jamaican marriage certificate for Holness and Serika Dunkley was dated June 20, 2003. JA 626-27. The homicide investigation also revealed that on November 5, 2008, Holness purchased a $500,000 life insurance policy for Ms. Dunkley to which Holness was the sole beneficiary. JA 357, 366. Catherine Wallace, a representative for Household Insurance Group, testified that the monthly premiums were paid with Holness's VISA card. JA 365, 367. She also testified that the policy would not have been issued if it had been known that the person purchasing the policy was not Ms. Dunkley. JA 368.

The investigation further revealed that Holness had been an air traffic controller for the United States Navy and that in April 2009 Holness had requested early release from his naval service. JA 372. That request had been denied by Holness's chain of command and Holness had been reassigned to "busy work," to which he was still assigned at the time of the murder. JA 373, 376. The reason Holness's request for early release from the Navy had been denied and that he had been reassigned was that Holness was under investigation for making false declarations in connection with a passport application for his son, who Holness had sought to bring into the United States from Jamaica. JA 447, 449. The Navy Criminal Investigator who conducted that investigation testified that in June 2008,

Holness had made a written admission that he had made false declarations for the purpose of fraudulently obtaining a passport. JA 449, 451. As a result, Holness was facing court-martial proceedings. JA 454, 643.

Another government witness, Deidre Williams, testified that she was Holness's girlfriend at the time of his arrest in June 2009. JA 383-86. Ms. Williams, who met Holness while they were serving together, testified that in January 2009, Holness informed her for the first time that he was married. JA 383. Ms. Williams testified that this news affected her relationship with Holness because, as she told him, she was not interested in a relationship with a married man. Holness told her that he did not "like" his present marriage, but "it wasn't his decision." JA 383. Ms. Williams further explained that Holness told her that he once had an interest in marrying his son's mother in Jamaica, but that he "wasn't able to" because "his family influenced him not to end the marriage...." JA 383-84.

### E.    The Testimony of Holness's Cellmate Stephen McGrath

Holness's essential claim on appeal is that the trial testimony of his former cellmate Steven McGrath regarding certain statements by Holness, the contents of a purported third-party confession letter written by Holness, and a recording of McGrath reading that letter, were improperly admitted because they were obtained

by McGrath in violation of Holness's Sixth Amendment right to counsel. Def. Br. 15.

McGrath testified that in July 2009 he was sentenced to 90 days of imprisonment at the Kent County Detention Center for failure to make restitution in the amount of $21,000 following his conviction for violation of Maryland home improvement laws. JA 493-97. For over a month prior to August 31, 2009, McGrath shared cell 208 with Holness, with whom he reportedly got along well. JA 499-500, 618-19. McGrath testified that Holness showed him some, but "not much" of the discovery materials from his pending state murder case. JA 503. McGrath stated that Holness showed him a picture of the victim lying dead in a field and some reports concerning the recovery of Holness's car in Washington, DC. JA 503-04. McGrath also stated that Holness told him that he was familiar with the highway routes in the vicinity of Crumpton due to driving back and forth to New York from Norfolk. JA 505. McGrath also testified that on several occasions he accommodated Holness's request to make three-way calls from the jail to Holness's brother. JA 506-07. McGrath also testified that Holness told him that he had disposed of the murder weapon in the Chester River, and that any fingerprints on the knife would deteriorate in the water. JA 508, 665.

McGrath testified that he came to believe that Holness had murdered his wife and that on August 18, 2009, he wrote a letter to the State's Attorney for Kent County in which he related that he may have information about the murder. McGrath requested that any assistance he provided be considered in conjunction with his motion for modification of sentence.[6]  JA 509, 513, 567-70.

Referring to that part of his letter in which he wrote that Holness "may have shared his secret with him," McGrath testified that he was referring to Holness's statement that he had disposed of the knife in the river.  JA 516-17.  McGrath wrote that Holness and his wife had a fight because she had learned that Holness was cheating.  JA 616-17.  McGrath also wrote that Holness told him that they had stopped at a rest area and that, "he was going to do it there" but that Holness decided to "head down to Crumpton area" instead.  JA 519, 569.  McGrath also wrote, "After arriving here, [Holness] said they almost got seen by a passing car as he was popping the trunk of [the] car and something about going to someone's house for help and eventually changed his mind."  JA 519-20.

In regard to Holness's mention of being seen by a passing driver, government witness Peggy Barnes testified that at about 1:30 a.m. on the day of the murder she was driving southbound on Route 290 when she saw a blue car  parked

_____

[6]      McGrath's letter to the State's Attorney was government trial exhibit 94A.

23

on the west side of the road.  She stated that the car's "trunk popped up" as she drove by.  JA 166, 664.

McGrath testified that after he sent the letter to the State's Attorney, he met with Maryland State Police Sgt. Steve Hall.  JA 524, 639.  Sgt. Hall confirmed that this meeting occurred on August 31, 2009.  JA 639.  This first meeting between Sgt. Hall and McGrath was recorded and occurred in the library of the Kent County Courthouse.[7]  JA 526-29.  McGrath confirmed that during the meeting he was "advised [he] could not ask Mr. Holness any questions," JA 582, and that he did not ask Holness questions unless something in the conversation called for him to do so:

> Q.  Now, is it your testimony that you absolutely positively just sat there and listened to Mr. Holness and never, never asked him any questions?
>
> A.  I listened to him [the] majority of the time.  I mean, unless he asked me, something required me to ask him a question then I never asked him a question.

JA 582-83.

McGrath testified that the information he provided to Sgt. Hall was essentially the same as that described in his letter to the State's Attorney.  JA 525.

---

[7]  The recording of the meeting between McGrath and Sgt. Hall was government exhibit 101-B.  It is Track One of the CD included with the Joint Appendix.

However, during his meeting with Sgt. Hall, McGrath also reported that Holness had made several comments about his blood being found on the victim's purse and on the "side door" of the car. JA 536, 540-41.

McGrath testified that about a week after their first meeting, Sgt. Hall provided him with a recording device. JA 528. Sgt. Hall confirmed that he gave the recorder to McGrath on September 15, 2009. JA 639. McGrath testified that while he had the recording device, Holness asked him to do him a favor. JA 529.

### F. Holness Requests McGrath to Help Him to Create a False Third-Party Confession.

McGrath testified that "one night" Holness asked him to help write a third-party "confession" letter to the Washington Post that would purport to show that the "carjacker was still out there." JA 70, 529. McGrath testified that Holness told him that he needed McGrath to write the "confession" letter because the "confession" had to be in someone else's handwriting and it "had to be in no way connected to him." JA 529. McGrath testified that the letter was not his idea and that he did not coach Holness to write it. JA 530. McGrath stated that he actually began to compose a letter for Holness in his own handwriting, but that Holness was dissatisfied with it. JA 530, 543-44. Over a period of a week or so, Holness composed a letter in his own handwriting. JA 529, 583. McGrath testified that Holness told him that after he was released, he wanted McGrath to print the letter

"from a library printer" and then mail it to news outlets from a location in the "DC area." JA 70-71, 531-32, 583. The idea, Holness told McGrath, was to make it appear as if the "real" carjacker mailed the confession letter from Washington, DC (where Holness's car was found). JA 529, 531-32, 583-84. As McGrath explained, "He [Holness] asked me to help him write a letter to the Washington Post, stating that the carjacker was still out there. That you know, how he had been remorseful for committing the crime. And then he wanted me to mail it when I got out." JA 529. The letter was never mailed and Holness told McGrath to throw it away. JA 543-44, 585. Instead, McGrath saved part of the letter and gave it to Sgt. Hall.[8] JA 531, 543-45, 585-86. McGrath explained that when Holness handed him the letter, he hid it among some of his own papers while he pretended to flush the letter down the toilet. JA 531, 542, 544, 585-86. McGrath testified that he gave the page of the letter he was able to retain (government exhibit 98A) to Sgt. Hall "about two days later." JA 531-32, 545, 587.[9] Sgt. Hall testified that McGrath gave him the "confession" letter on October 1, 2009. JA 71. The section of the letter retained by McGrath began with, "I had my duct tape in hand, pistol in the other." JA 545, 611-15, 668. At trial, State Police handwriting examiner

---

[8]     The letter recovered by McGrath is government exhibit 98. JA 542.

[9]     Exhibit 167A – referred to in the testimony – was a poster-sized version of exhibit 98A.

Diane Lawder opined that the "confession" letter recovered by McGrath was indeed written by Holness. JA 611-15.

In addition, McGrath testified that while Holness was in the process of drafting the "confession" letter, McGrath used the digital recorder provided by Sgt. Hall (on September 15, 2009) to make an audio recording of the letter. JA 71, 543, 546-47, 584-86. McGrath testified that while Holness was writing the letter he sometimes "seen it laying on the desk, [when Holness] was working on it." JA 583. McGrath testified that "once in a while" Holness would show him the letter. McGrath stated that one day while Holness was out of the cell he "grabbed" the letter and read it into the recorder (which he had hidden in his pillow).[10] JA 546. "I mean, I took it out of my pillow and grabbed the letter while he was in the shower and I just dictated into the tape recorder so we would have it." JA 534, 546. McGrath testified (as can be heard on the recording) that Holness returned from the shower while he was recording the letter and that even though Holness saw him with the letter, Holness "didn't care because they were working on it together." JA 547, 549. McGrath turned the confession letter and the audio recording over to Sgt. Hall on October 1, 2009. JA 71, 548, 640. Sgt. Hall testified that the time

---

[10]     The audio recording of McGrath reading the "confession" letter was government exhibit 94, and can be found at Track Two on the CD included in the Joint Appendix. The confession letter retrieved by McGrath begins at 5 min. 48 seconds on Track Two.

stamp in the recording device established that the letter was recorded by McGrath on September 16, 2009.  JA 640.

After receiving the purported third-party confession and McGrath's recording on October 1, 2009, Sgt. Hall obtained a search warrant for Holness's cell, which he still shared with McGrath.  JA 640.  The search warrant was executed on October 6, 2009.  JA 640-41.  Recovered during that search was another version of the third-party confession, in McGrath's handwriting.  McGrath testified that this version of the purported third party confession, similar to that recovered by McGrath, was dictated to him by Holness but found to be unsuitable.  JA 641-42, 529, 543, 678-80.  This version of the third party confession also is included in the Joint Appendix.  JA 678-80.

### G.     McGrath Is Outed as a "Snitch."

McGrath was released from the Kent County Detention Center on October 10, 2009.  JA 620.  Following that, Holness was briefly housed, alone, in cell 318.  JA 620.  While Holness was housed in cell 318, deputy sheriffs discovered that the words "Stephen Scott McGrath, rat snitch" and McGrath's home address and phone number had been written in large letters on the wall of the cell.  JA 554, 622.  Referring to a photograph of the writing on the cell wall, McGrath confirmed that the address and phone number were indeed his.  JA 554.

28

## H.    The Hearing on Holness's Motion to Suppress

As he did in the district court, Holness asserts that McGrath obtained the challenged statements and evidence from Holness in violation of Holness's Sixth Amendment right to counsel because McGrath was acting as Sgt. Hall's "agent" and that McGrath deliberately elicited the incriminating statements from Holness. Def. Br. 6.  It is not disputed that, on July 7, 2009, Holness was indicted in Kent County for the first degree murder of Ms. Dunkley and that he was represented on that charge while housed with McGrath.  JA 113.  Holness was not indicted (or otherwise charged) for the present federal offenses until November 24, 2009.  JA 3, 14-17, 41-44.

On March 14, 2011, Sgt. Hall testified at the motions hearing held in relation to Holness's Sixth Amendment claim.  JA 61-104.  Sgt. Hall recounted that Holness was arrested for the Dunkley murder on June 5, 2009.  JA 62.  Sgt. Hall testified that he first encountered Holness on the morning of June 5, 2009, at the emergency room of the Chester River Hospital while Holness was being treated for a cut on his left forearm.  JA 67, 74-75, 86, 672.[11]  Following his discharge, Holness was transported to the Maryland State Police barracks in Centreville, Maryland.  At about 10:15 a.m., Sgt. Hall advised Holness, in writing, of his

---

[11]    A photograph of the cut on Holness's arm is included in the Joint Appendix at page 672.

*Miranda* rights.  JA 62-64, 66, 78.  Sgt. Hall testified that Holness responded to questioning (as described above) until Holness reached a point where he declined to make any further statements and asked for an attorney, ending the interrogation. JA 65, 80.  That afternoon, Holness reinitiated contact with Sgt. Hall (that Holness did so is not a matter of dispute) and requested that he be taken to the murder scene so he could show Sgt. Hall what happened.  JA 65, 81, 87.  Before doing so, Sgt. Hall took the precaution of re-advising Holness of his *Miranda* rights, in writing. JA 65, 83.  This occurred at about 1:55 p.m., following which Holness was driven to the murder scene where he was videotaped as he described the murder of Ms. Dunkley.  JA 65-67, 82-83.  After this reenactment, Holness was returned to the Centreville barracks.  The interrogation continued until about 5:30 p.m., when Holness requested an attorney.  JA 84.  That was the final interview of Holness.

On August 21, 2009, Sgt. Hall received a call from the Kent County State's Attorney's Office informing him that a letter concerning the Dunkley murder had been received from a Kent County Detention Center inmate named Stephen McGrath.  JA 70, 87-88, 90, 722-24.  The letter included details about the murder that were alleged to have been provided to McGrath by Holness.  JA 90. Sgt. Hall obtained a copy of the letter and on August 31, 2009, he met with

McGrath at the Kent County Courthouse. JA 87-88, 90. The meeting was recorded.

Sgt. Hall testified that because he was aware that Holness was represented by counsel he informed McGrath that he could not question Holness. JA 91. "I don't know what the exact words are. But I told [McGrath] that because [Holness] was represented or that some certain legal issues, that he could not question Holness about the investigation." JA 91. Sgt. Hall refuted counsel's suggestion that despite telling McGrath that he could not question Holness, he "really" wanted him to, JA 92:

> Q.    You didn't want any more information?
>
> A.    I told [McGrath] that I wanted information, but I told him...that he can't ask him any questions.

JA 92-93.

Sgt. Hall testified that during his meeting with McGrath on August 31, 2009, McGrath reiterated the information that had already been provided in his letter to the State's Attorney. McGrath also provided some additional information. The substance of Sgt. Hall's recorded interview of McGrath is summarized below.

| Time(min /sec) | Meeting between Sgt. Hall and McGrath on August 31, 2009 Description of Statement |
|---|---|
| 1:47-2:04 | McGrath states that he is Holness's cellmate. |
| 3:15-34 | McGrath states that he is serving a sentence for failure to pay |

| | |
|---|---|
| | restitution. |
| 4:19-23 | McGrath states that Holness said he had a fight with his girlfriend. |
| 4:51-5:47 | McGrath states that Holness told him that they stopped at a rest area to get gas; that while Holness urinated between some cars the carjacker jumped in the car. |
| 5:55-6:27 | McGrath states that Holness told him that after Holness and his wife left New York, they had an argument about a text Holness received from his girlfriend. |
| 6:55-7:16 | McGrath states that Holness told him that "the girl" [Ms. Dunkley] was really Holness's cousin; that their marriage was arranged to get her into the U.S. |
| 7:53-8:32 | McGrath states that Holness told him he was very familiar with Crumpton and that he went through Crumpton "all the time" as a short cut to the Bay Bridge. |
| 9:19-9:39 | McGrath states that Holness told him that he was worried that the blood on the victim's purse and in the car may be his. |
| 10:15-:40 | McGrath states that Holness said that the carjacker told them both to get out and then the carjacker got out and "set the gun on the trunk." |
| 11:29-:37 | McGrath states that Holness said his brother was "here" when Holness was at the hospital. |
| 12:31-14:21 | McGrath states that Holness told him that he had purchased life insurance about six months before and said something about trying to make it appear to the Navy that Holness was really married. |
| 14:40-15:22 | McGrath confirms that Holness never expressly admitted to him that he committed the murder. |
| 15:36-:46 | McGrath states that when he asked Holness how many times his wife was stabbed, Holness laughed. |
| 16:08-17:03 | McGrath states that Holness said the carjacker wore a ski mask; that "her" purse was thrown in a ditch; that Holness was worried about "the duct tape residue on his arms." |

| 17:22-18:36 | McGrath states that Holness told him he was worried that a car passed him while he (Holness) was at the trunk of the car. |
|---|---|
| 18:50-19:16 | McGrath states that Holness told him that after the attack, he ran "somewhere" and "knocked on the door" but nobody answered. |
| 19:36-20:00 | McGrath confirms that his statement in the letter that Holness killed his wife over an argument after he was caught cheating was McGrath's interpretation of what Holness told him and not an admission by Holness. |
| 20:07-:25 | McGrath states that Holness told him that the defense was "planned from the beginning" and that he was concerned that nobody [the police] got the "tapes" of the carjacker "dumping" the car in "DC." |
| 22:00-:50 | McGrath states that since about August 17, when he was housed again with Holness, Holness stated that he was concerned about his blood being on the victim's purse. |
| 23:06-:27 | McGrath states that Holness is in close contact with his brother and that a letter from Holness to his brother arrived with tape on it, as if it had been opened. |
| 23:34-:43 | McGrath repeats that Holness has not admitted that he committed the murder. |
| 24:09 | McGrath confirms that he requested a modification of sentence in his letter; that the State's Attorney can either contest it or not; that "either way I got forty days left." |
| 24:50-26:53 | Sgt. Hall explains that he "can't tell you to go in there and ask questions..." McGrath states, "He'll tell me anyway."

Sgt. Hall states. "We are looking for information. But because he is represented... there are certain legal things that we can't do."

Sgt Hall provides an example and explains that if he were to send someone in to ask questions, that person would be "acting as his agent - as a police officer."

Sgt. Hall states, "I would like to hear what he has to say, but I can't |

| | tell you to go in there and ask questions....I can't tell you to do that. I can't tell you to ask hm questions directly...."

Sgt. Hall states, "I can't tell you to do that.  But anything you might find out by speaking to him, you can let me know."

Sgt. Hall offers his card.  McGrath declines, but takes Sgt. Hall's phone number. |
| --- | --- |

Sgt. Hall testified that following their initial meeting, McGrath called him and reported that Holness was "writing a confession letter that [Holness] wanted McGrath to send to various media outlets, newspapers etc." JA 70-71.  On September 15, 2009, Sgt. Hall met with McGrath and provided him with a digital tape recorder.  JA 71, 93, 640.  On October 1, 2009, Sgt. Hall met with McGrath and recovered the recorder, into which McGrath had read the purported third-party confession letter written by Holness.  JA 71, 534, 640.  McGrath also gave Sgt. Hall a single page of that letter, which McGrath had been able to recover from the cell he shared with Holness.  JA 71, 531, 534, 640-41, 668-69.  As noted, that letter was found to have been written by Holness.  JA 611-15.

## I.      The District Court Denies Holness's Motion to Suppress.

Following argument, the district court denied Holness's motion to suppress. JA 113-20.  The defense argument then was much as it is now.  JA 113-16.  While the district court's ruling is now a matter of *de novo* review, it remains that the

district court recognized that McGrath's testimony and evidence was not barred by the "offense specific" Sixth Amendment that applied to Holness's state murder charge, but not to the offenses charged in the subsequent federal indictment.  JA 119.

## SUMMARY OF ARGUMENT

I.      Holness's motion to suppress the statements and evidence obtained by McGrath was properly denied by the district court because the Sixth Amendment right to counsel that attached to Holness's state indictment for murder did not extend to use of that evidence in the trial for the federal offenses for which Holness was not indicted until November 24, 2009.  The Sixth Amendment is offense specific and attaches only to those offenses for which a defendant is formally charged or to related offenses deemed to be the "same offense" upon application of the *Blockburger* test.  Here, Holness concedes that the offenses in the subsequent federal indictment are not the "same offense" as those in Holness's state indictment because the state and federal charges are not the same under *Blockburger*.  Also, this Court has explicitly held that no matter how identical the conduct they proscribe, indictments by separate sovereigns cannot ever be the "same offense" under *Blockburger*.

Aside from the inapplicability of the Sixth Amendment right to counsel due to the sequence of the indictments and the principles of dual sovereignty, Holness also concedes that, no matter how broadly it might be construed, the Sixth Amendment did not apply to Holness's statements to McGrath *prior* to August 31, 2009. In addition, Holness's statements to McGrath after August 31, 2009, and the confession letter and recording that McGrath provided to Sgt. Hall on October 1, 2009, did not violate the Sixth Amendment because they were not the product of "interrogation" or its functional equivalent.

Finally, the recovery of evidence from Holness's cell, either by McGrath or by Sgt. Hall, did not violate Holness's Fourth Amendment rights since the Supreme Court has held that the Fourth Amendment does not extend to a search and seizure of evidence from a defendant's jail cell.

## ARGUMENT

I.    **The Sixth Amendment Right to Counsel That Attached to Holness's State Murder Indictment Did Not Extend to Any Evidence Obtained by McGrath That Was Introduced at the Trial on Holness's Subsequent Federal Indictment.**

A.    **Standard of Review**

In assessing a district court's decision on a motion to suppress, this Court reviews factual findings for clear error and legal determinations *de novo*. *See United States v. Lentz*, 524 F.3d 501, 520 (4th Cir. 2008). In so doing, the Court

construes the evidence in the light most favorable to the prevailing party and gives due weight to inferences drawn from those facts by resident judges. *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010).

**B.      The Sixth Amendment Is Offense Specific and Does Not Extend to Statements Made by the Defendant Prior to the Federal Indictment That Led to the Trial in Which the Statements Were Introduced.**

Both below and now on appeal, Holness has claimed that his statements to McGrath and the letter and audio recording that McGrath provided to Sgt. Hall on October 1, 2009, should have been suppressed pursuant to his Sixth Amendment right to counsel since he had been indicted in Maryland state court for first degree murder and was represented by counsel when that evidence was obtained by McGrath.  JA 18-23, 45-57; Def. Br. 15.  The district court, however, properly held that the Sixth Amendment did not preclude admission of Holness's statements to McGrath because they were introduced in a trial for federal offenses for which Holness had not been indicted when the statements and evidence were obtained.  JA 119-21.  In the face of all authority to the contrary, Holness continues to argue that the state and federal offense are "the same" and that the contested evidence was the product of improper interrogation by McGrath.  Def. Br. at 15.  This Court should decline Holness's invitation to depart from its settled precedent.

As has been held many times, the Sixth Amendment is "offense specific." *United States v. Payne*, 954 F.2d 199, 203-04 (4th Cir. 1992), *quoting McNeil v. Wisconsin*, 501 U.S. 171 (1991); *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001). "The Sixth Amendment right [to counsel ] ... is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. at 175 (internal quotation marks, alterations, and citations omitted). Accordingly, only those "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges." *Maine v. Moulton*, 474 U.S. 159, 180 (1985). The Supreme Court has held that government investigations of new criminal activity for which an accused has not yet been indicted do not violate the Sixth Amendment right to counsel. *See McNeil*, 501 U.S. at 179; *Illinois v. Perkins*, 496 U.S. 292, 299 (1990) (holding that a government interrogation of an accused did not violate the Sixth Amendment because "no charges had been filed on the subject of the interrogation"); *United States v. Kidd,* 12 F.3d 30, 32 (4th Cir. 1993) ("Kidd's right to counsel had attached only with respect to the drug distribution and conspiracy offenses for which he had been indicted.").

The Sixth Amendment functions to "protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." *McNeil v. Wisconsin*, 501 U.S. at 175; *Payne*, 954 F.2d at 203 (same); *Texas v. Cobb*, 532 U.S. at 167-68; *United States v. Alvarado*, 440 F.3d 191, 194 (4th Cir. 2006) (defendant's statements were properly admitted in federal trial when they were made before his right to counsel attached to the federal offenses for which he was later indicted because Sixth Amendment right to counsel attaches only to the specific offense for which a defendant is indicted). In *Payne*, *supra*, the defendant had been indicted for federal tax offenses when he made certain post-arrest statements. Following *McNeil*, this Court held that Payne's Sixth Amendment right to counsel did not preclude use of those statements in his trial for federal drug and firearm offenses because Payne had not been indicted for those offenses when the challenged statetments were made. *Payne,* 954 F.2d at 203-04. "Any invocation of Payne's Sixth Amendment right to counsel with respect to the tax offenses [for which he had been indicted] thus does not extend to the drug and weapons offenses, for which no Sixth Amendment right to counsel had yet attached." *Id.* at 204. "Incriminating statements to other crimes, as to which the Sixth Amendment has not yet attached, are, of course, admissible at a

trial of those offenses." *Id.*, *quoting Maine v. Moulton*, 474 U.S. at 179-80; *Texas v. Cobb*, 532 U.S. at 167-68 (describing *McNeil v. Wisconsin* as having held that "a defendant's statements regarding offenses for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses").

In *Alvarado*, 440 F.3d at 194, this Court again acknowledged the "offense specific" nature of the Sixth Amendment, limiting its application to "criminal prosecutions," which it defined to include only "formal charges," such as indictments, and holding that a defendant's arrest on a federal criminal complaint did not constitute a "formal charge" that triggered the Sixth Amendment right to counsel. *Id*. at 199-200. Following Supreme Court precedent, the Court held that the Sixth Amendment right to counsel "attaches only at or after the initiation of adversary judicial proceedings against the defendant." *Id*. Since Holness was not indicted by a federal grand jury until November 24, 2009, JA 3, the Sixth Amendment did not attach to any of the statements admitted at his federal trial that were obtained before that date.

Despite the holdings in *Cobb* and *Alvarado*, Holness argues that the Sixth Amendment right to counsel triggered by his state indictment should have extended to bar use of his statements at his federal trial because the state murder

charge and his federal charge were so "closely related."  *See* Def. Br. 22-28.  That

argument, however, continues to be unavailing.  The Supreme Court has held that

the Sixth Amendment right to counsel for an offense for which the defendant has

been indicted extends to a "related offense" only where, based on a comparison of

the elements of the respective indictments, the subsequently indicted offense

"would be considered the same offense under the *Blockburger* test."  *Texas v.

Cobb*, 532 U.S. at 168-69.[12]  The elements of the offenses in Holness's state and

federal offenses are distinct, and Holness has *conceded* both below and in his brief

that the state and federal crimes for which he has been indicted are *not* the "same

offense" pursuant to a *Blockburger* analysis of the elements of the offenses charged

in the two indictments.  JA 114; Def. Br. 28.

　　　　Nonetheless, Holness argues that the Sixth Amendment right to counsel that

attached upon his state indictment should extend to his subsequent federal

indictment because the two indictments charge essentially the "same offense."

Def. Br. 22-28; JA 45-57, 113-15.  Again, this argument flies in the face of *Texas*

*v. Cobb,* in which the Court reiterated that the "specific offenses" to which the

---

[12]　　　　In *Blockburger v. United States*, 284 U.S. 299 (1932), the Court
explained that "where the same act or transaction constitutes a violation of two
distinct statutory provisions, the test to be applied to determine whether there are
two offenses or only one is whether each provision requires proof of a fact which
the other does not."  *See Texas v. Cobb*, 532 U.S. at 173.

Sixth Amendment extends are those for which the defendant has been formally

charged, *and* that the Sixth Amendment does not extend to offenses for which the

defendant has not been formally charged even if they are "factually related" to an

indicted offense. *Id*. at 168-69, 172. Thus, the factual similarity of the state and

federal charges in this case is of no moment. Indeed, in addition to ignoring

*Blockburger* and *Texas v. Cobb*, Holness's "same offense" argument asks this

Court to disregard its prior explicit holding, in which it applied *Texas v. Cobb,* that

no matter how factually similar the facts supporting a state indictment and a federal

indictment may be, **"federal and state offenses are necessarily separate crimes**

for the purposes of the Sixth Amendment, because they originate from autonomous

sovereigns that each have the authority to define and prosecute criminal conduct."

*Alvarado*, 440 F.3d at 194 (emphasis added); *see also id.* at 196 ("Since they arise

from separate sovereigns, state and federal offenses are not the same for purposes

of the Sixth amendment right to counsel.").

In *Alvarado*, the Court rejected the defendant's effort to extend the Sixth

Amendment right to counsel to bar use of his statements at the trial of a subsequent

federal indictment on the ground that the federal indictment was the "same

offense." *Id*. at 194-96. The Court held that no matter how similar, state and

federal indictments are *necessarily* different and therefore can *never* be the "same

offense" for purposes of the Sixth Amendment right to counsel or *Blockburger*.  *Id*. at 196-98.  "The Supreme Court has continually held that federal and state crimes are not the same offense, *no matter how identical the conduct they proscribe*."  *Id*. at 196 (emphasis added).

While Holness may wish that the established Sixth Amendment jurisprudence were otherwise, his arguments simply cannot prevail.  The district court correctly applied the Sixth Amendment right to counsel as it has been defined by the Supreme Court in *McNeil v. Wisconsin*, *Maine v. Moulton*, and *Texas v. Cobb*, and applied by this Court in cases such as *Payne* and *Alvarado*.  While Holness is clearly frustrated by the controlling Sixth Amendment precedent that the right to counsel does not extend to the statements he provided to McGrath – whether before or after August 31, 2009 – his position has been considered and properly rejected.

### C.    Holness Concedes That the Sixth Amendment Was Not Implicated by Any Statements to McGrath Prior to August 31, 2009.

The decisive answer to Holness's Sixth Amendment claim is stated above. None of the statements or evidence about which McGrath testified was obtained in violation of the Sixth Amendment.  Beyond that, although Holness has not undertaken to show *when* the various statements attributed to him were made, he

correctly concedes that in no event would the Sixth Amendment bar the statements attributed to Holness that are described in McGrath's August 18, 2009, letter to the State's Attorney or in McGrath's meeting with Sgt. Hall on August 31, 2009, because, at the earliest, McGrath could not have been a government agent until *after* his meeting with Sgt. Hall.  "Appellant cannot argue a Sixth Amendment violation regarding this phase."  Def. Br. 29; JA 513; *see Lentz*, 524 F.2d at 520 (affirming that Sixth Amendment did not apply to information collected by cellmate who initially obtained defendant's statements on his own initiative and who was later instructed to serve only as a listening post or to discuss matters of common interest); *Harker v. Maryland*, 800 F.3d 437, 444-45 (4th Cir. 1986) (inmate informant did not conduct impermissible Sixth Amendment interrogation where he was not paid, was not acting under instructions, and was responding to general request for information).

McGrath's testimony appears to include only two statements or topics attributed to Holness that were not described in either the McGrath letter or his meeting with Sgt. Hall.  One was that Holness "asked" McGrath to write the third party confession letter, as to which the uncontradicted testimony is that *Holness* initiated this request.  JA 529.  The second is McGrath's testimony that Holness stated he "threw [the murder weapon] in the river," which, given Holness's other

pre-August 31, 2009 statements, was cumulative and, more importantly, was part of the broader, ongoing dialogue about the murder that was initiated by Holness for his own purposes, the most important being that Holness's plan to deflect culpability for the murder required him to recruit someone to write and mail the third party confession. JA 508-09, 529-30. The person Holness chose to recruit to carry out the scheme was his cellmate, McGrath, who was about to be released from the county detention center, JA 508, 529-31, 552-53: "[Holness] just made an off-the-wall comment that I know I needed three people to do this, and the third person being me, to write the letter or mail the letter." JA 553.

Given that Holness correctly concedes that none of the information described in McGrath's letter of August 18, 2009, or provided to Sgt. Hall on August 31, 2009, was subject to suppression, it is worth summarizing what evidence is encompassed by that concession. Def. Br. 29; JA 513, 567.[13]

| Statements Attributed to Holness by McGrath | Source |
|---|---|
| that Holness laughed when asked how many times the victim was stabbed (JA 503) | tape |
| that Holness was worried about whether the police found tape of the person "leaving the car in Washington, DC, | Letter and tape |

---

[13]     "Letter" refers to McGrath's August 18, 2009, letter to the Kent County State's Attorney, which was read into the record during McGrath's direct examination. JA 502-24. "Tape" refers to the recorded meeting between Sgt. Hall and McGrath.

| | |
|---|---|
| where there were "cameras all over" (JA 503-04, 570) | |
| that Holness was familiar with Crumpton from driving to New York from Norfolk; he knew all of the routes (JA 505, 519, 569) | letter and tape |
| that Holness's wife learned that he was cheating on her, which caused a fight (JA 517, 568) | letter and tape |
| that Holness was almost seen by a passing car as he "popped the trunk" of his car at the scene (JA 518-20, 576) | letter and tape |
| that Holness said "something" about going to someone's house for help but he changed his mind (JA 519, 521-22) | letter |
| that the house Holness went to was a trailer and that he went to the front door and then the back door (JA 521-22) | letter and tape |
| that Holness stated that he was concerned that his brother's mail was being opened (JA 507) | tape |
| that Holness "kept bringing up about [Holness's] blood being on the purse and the side door of the car" (JA 540-41) | tape |
| that Holness stated the carjacker placed the gun on the trunk of the car while taping him (JA 579) | tape |
| that Holness stated that he had an arranged marriage with the victim and wanted a more traditional marriage; that the Navy was questioning his marriage (JA 580) | tape |

Since McGrath referred to the above statements attributed to Holness in either his letter to the State's Attorney or in his recorded meeting with Sgt. Hall on August 31, 2009 (or both), the Sixth Amendment could not have applied to the

underlying statements by Holness, since prior to August 31, 2009, McGrath cannot be construed to have been an agent of the government. *See* Def. Br. 29.

**D.    There Was No Interrogation of Holness by McGrath.**

Holness's state Sixth Amendment right to counsel did not extend to anything Holness said or did prior to November 24, 2009, the date of his federal indictment. JA 3.  In addition, it is also apparent that the information and evidence obtained by McGrath was not the product of "interrogation."  Def. Br. 7, 9, 15-22.  Given the Supreme Court's definition of interrogation, the record does not support a finding that any of the statements attributed to Holness were "elicited" by McGrath.  The district court found that Sgt. Hall clearly directed McGrath not to interrogate Holness, who, for all of his complaints, does not cite a single example of a statement attributed to Holness that was elicited by improper interrogation.  JA 119-21.  Indeed, the record shows that the only time McGrath asked Holness any "questions" was when he asked Holness what to write in the fraudulent confession letter Holness dictated to McGrath.  JA 529-30, 543, 584.

The Supreme Court had held that a suspect is "interrogated" by law enforcement officers (or their agents) when "subjected to either express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" language in *Innis* is meant to capture

"interrogation environments" in which the suspect's will is subjugated to that of his examiner, undermining the privilege against self-incrimination. *Id*. at 299. A suspect is subjected to the "functional equivalent" of interrogation when the police use "words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," meaning any response that the prosecution may seek to introduce at trial. *Id*. at 301 & n.5.

"Interrogation" was also defined in *Massiah v. United States*, 377 U.S. 201, 206 (1964), where the Supreme Court held that a defendant's Sixth Amendment right to counsel is violated when the government "deliberately elicit[s]" incriminating evidence from an accused "after he ha[s] been indicted and in the absence of his counsel," and introduces those statements against him at trial. *Id*.

In *United States v. Henry*, 447 U.S. 264, 270-73 (1980), the Supreme Court held that use of the testimony of a fellow inmate who had a formal "prearrangement" with the FBI by which he was "expressly commissioned to secure evidence," and who had a contingent fee agreement, violated the Sixth Amendment right to counsel. *Id*. The circumstances of any "interrogation" of Holness by McGrath, however, are very different than those of the informant in *Henry*. Here, the district court found that McGrath was clearly instructed not to

question Holness. JA 119-20. Also, as discussed above, the bulk of the statements

attributed to Holness were made *prior* to McGrath's August 31, 2009, meeting

with Sgt. Hall. McGrath was not a paid informant. He was promised nothing and

received nothing (though in his letter, McGrath asked that the state not oppose his

motion to modify his 90-day sentence, which never occurred). JA 514-16, 524-26.

McGrath's role here is less like the informant in *Henry* and more akin to the use of

a jailhouse informant that was affirmed in *Thomas v. Cox*, 708 F.2d 132, 135-36

(4th Cir. 1983). In *Thomas,* this Court held that there was no Sixth Amendment

violation where, in comparison with the informant in *Henry*, the jailhouse

informant was "self-initiating," unpaid, and instructed not to question the

defendant, thus evidencing a relationship with the government that lacked the

degree of "prearrangement" and "ongoing cooperation" found to be present in

*Henry*. *Id*. "The court must look at all of the circumstances to determine whether

the informant's actions are "fairly attributable to the government." *Id.* at 136. This

Court has recognized that "the mere presence of a jailhouse informant who had

been instructed to overhear conversations and to engage a criminal defendant in

some conversations [is] not necessarily ... unconstitutional." *Harker v. Maryland*,

800 F.2d at 444-45; *Lentz*, 524 F.3d at 521 (informant who initially collected

information on his own was not converted to a government agent by later

instructions to act only as a listening post and to limit conversations to "matters of common interest").

Thus, the government submits that, in addition to the reasons set forth above, Holness's argument should be rejected because the record fails to establish that the statements and evidence attributed to Holness were the product of improper interrogation by McGrath.

### E. The Physical Evidence Recovered from Holness's Cell Was Not Protected by the Fourth Amendment.

In the district court, Holness also sought suppression of the evidence from his cell on Fourth Amendment grounds, alleging that the seizure of this evidence lacked "probable cause." JA 18-22. Again, Holness has overlooked established precedent that is contrary to his position. In *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court held that a prisoner has no expectation of privacy against searches of his property while in jail. The Court observed:

> Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

*Id*. at 525-26.

The Supreme Court reiterated this position in *Samson v. California*, 547 U.S.

843, 848 (2006) (recognizing that *Hudson v. Palmer* held that traditional Fourth

Amendment analysis of the totality of the circumstances is inapplicable to the

question of whether a prisoner has a reasonable expectation of privacy in his prison

cell). This Court has also continued to apply *Hudson* to individuals, such as

Holness, who are in jail awaiting trial. *See Jones v. Murray*, 962 F.2d 302, 306

(4th Cir. 1992). "With the person's loss of liberty upon arrest comes the loss of at

least some, if not all, rights to personal privacy otherwise protected by the Fourth

Amendment. Thus, persons lawfully arrested on probable cause and detained lose

a right of privacy from routine searches of the cavities of their bodies and their jail

cells (citations omitted), as do convicted felons." *Id.; United States v. Jeffus*, 22

F.3d 554, 559 (4th Cir. 1994) (same).

Accordingly, setting aside that McGrath's uncontradicted testimony is that

Holness invited, and very much needed, McGrath's involvement in the confession

scheme, the Fourth Amendment simply does not apply to the seizure of the

purported confession letters from Holness's jail cell. JA 529-30, 640-42.[14] In

_____

[14]     It may be noted that although Holness invoked his *Miranda* Fifth
Amendment right to counsel during the post-reenactment interrogation on June 5,
2009 (JA 84, 86), even if McGrath were deemed to be an agent of the government
his conversations with Holness were not "custodial" as that term has been defined
by the Supreme Court, and thus would not be subject to suppression on Fifth

short, neither the Sixth Amendment nor the Fourth Amendment operated to bar the evidence provided by McGrath.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that the defendant's conviction and sentence should be affirmed.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____/s/_____
John F. Purcell, Jr.
Assistant United States Attorney
District of Maryland
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201

March 27, 2012

---

Amendment grounds. *See Maryland v. Shatzer*, ___U.S. ___, 130 S. Ct. 1213 (2009) (incarceration not "custody"); *Illinois v Perkins*, 496 U.S. at 292 (use of undercover to obtain incriminating statements from incarcerated defendant did not implicate *Miranda*.); *id.* at 297 ("*Miranda* forbids coercion, not mere strategic deception..."); *Howes v. Fields*, ___U.S. ___, 2012 WL 538280 (2012) (where questioning of prisoner was deemed "non-custodial").

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## CERTIFICATE OF COMPLIANCE

1.      This brief has been prepared using **WordPerfect 9, Times New Roman, 14 Point**.

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains **12,500** words.  I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.


_____/s/_____
John F. Purcell, Jr.
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing Brief of the Appellee was electronically filed with the Clerk of the United States Court of Appeals for the Fourth Circuit and that two copies were mailed to the attorney listed below on this 27th day of March, 2012:

Jonathan A. Gladstone, Esq.
Law office of Jonathan Gladstone
113 Ridgely Avenue
Annapolis, Maryland 21401


_____/s/_____
John F. Purcell, Jr.
Assistant United States Attorney